UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

JUAN MEJIA,

                Petitioner,          **MEMORANDUM & ORDER**

   - against -             No. 1:20-cv-2836(KAM)

SUPERINTENDENT, ELMIRA CORRECTIONAL
FACILITY,

                Respondent.

----------------------------------X

**KIYO A. MATSUMOTO, United States District Judge:**

     Petitioner Juan Mejia, proceeding *pro se*, petitions for a
writ of habeas corpus in accordance with 28 U.S.C. § 2254,
alleging that his state custody violates his federal
constitutional rights.  (Pet. Under 28 U.S.C. § 2254 for Writ of
Habeas Corpus by a Person in State Custody ("Pet."), ECF No. 1.)
For the reasons below, the Court respectfully denies the
Petition.

**BACKGROUND**

     In resolving Mejia's Petition, the Court has reviewed the
Petition, the State's opposition, and the state court record.[1]

---

[1] The State filed the state court record as several attachments to its
opposition brief.  The appellate court documents comprise ECF Nos. 11-1 and
11-2, and the consecutively paginated trial and sentencing transcripts span
ECF Nos. 11-3 through 11-8.  The Court cites documents from the appellate
court record according to the page numbers assigned by the Court's electronic
docketing system and cites the trial and sentencing transcripts according to
their internal pagination.

(*See* Pet.; Aff. & Mem. of Law in Opp'n to Pet. for Writ of Habeas Corpus ("Opp'n"), ECF No. 11; ECF Nos. 11-1–11-8.)

## I.  Factual Background

In April 2011, Mejia lived in Queens with his girlfriend and her family, including her brothers Elias and Andres Moros.[2] (Trial Tr. 710:24–711:5, ECF Nos. 11-1–11-8.)  Mejia asked Elias if he knew of anyone Mejia could rob, and Elias suggested Thomas Shanis as an "easy target" who had a lot of money and was unlikely to call the police because he was a drug dealer.  (*Id.* 718:17–19, 764:1–3.)  Mejia then traveled to Pennsylvania to get guns and pick up his brother, Domingo Mateo, to help him.  (*Id.* 719:21–720:5.)  The men planned for Mejia and Mateo to enter Thomas's apartment, tie him up, and take the money while Elias stood lookout.  (*Id.* 721:8–17.)  Elias told Andres beforehand that Mejia wanted to rob Thomas, but Andres did not know when the robbery would occur and was not asked to participate.  (*Id.* 982:21–983:17, 984:20–22.)

On the morning of May 3, 2011, Mejia took a cell phone from his girlfriend, Desiree Moros, and gave it to Elias to use during the robbery.  (*Id.* 723:13–24, 726:6–7.)  Elias arrived at the lookout location near Thomas's Queens apartment and called Mejia.  (*Id.* 729:2–9.)  The call went to voicemail, but Elias

---

[2] Where multiple people have the same last name, the Court refers to them by their first names.

soon after received a call from Mejia (using Mateo's phone), who said to keep watch because he and Mateo were about to enter. (*Id.* 729:10-25.)  Elias confirmed that they were "clear."  (*Id.* 731:15-20.)  As Thomas returned home from walking his dog, Mejia and Mateo pushed him into his apartment.  (*Id.* 617:24-618:4.) Mateo stabbed the dog in the neck and then stabbed Thomas in the back when Thomas tried to fight back.  (*Id.* 621:1-6, 735:18-20.) Mejia pistol-whipped Thomas, tied him up, and left him unconscious on the floor.  (*Id.* 736:3-8.)  Mejia and Mateo then ransacked the apartment.  (*Id.* 621:21-622:20, 625:25-626:8.)

   Thomas's mother, Zelda, lived with her son and was present during the robbery.  Mateo held a gun and knife to her head and threatened to kill her if she moved.  (*Id.* 614:23-615:1, 621:17-20.)  She heard Mejia speak on the phone and watched him pour bleach around the apartment because Thomas's "blood was all over the house."  (*Id.* 626:9-628:12.)  Mejia and Elias forced her into the bedroom, tied her to a chair, and taped her mouth shut. (*Id.* 622:24-625:24.)  She managed to free a hand and call 911 after they left.  (*Id.* 630:7-10.)  Though she never identified the robbers, she gave physical descriptions based on their approximate heights, weights, and skin tones.  (*Id.* 642:3-646:2.)  She first thought they were Black when she saw them but then "knew they were Hispanic" after she heard them speak Spanish.  (*Id.* 619:16-20.)

3

When the police arrived, Zelda answered the door crying hysterically with her hands still duct taped.  (*Id.* 580:4-18.) The paramedics found Thomas on the kitchen floor having lost about a third of his blood volume and pronounced him dead at the scene.  (*Id.* 604:19-605:19, 607:13-18.)  The police transported Thomas's dog to an animal hospital where he later recovered. (*Id.* 612:10-613:17.)

Meanwhile, Mejia returned to his apartment with Elias and Mateo.  (*Id.* 986:5-7.)  The men told Andres, who had been asleep and unaware of where the others were, about the robbery.  (*Id.* 986:15-17, 991:21-993:13.)  Andres observed the others handling money, a revolver, a dagger, a jar of marijuana, and a videogame controller.  (*Id.* 990:1-991:20.)  At Mejia's order, Andres washed Mejia's bloody clothes and gave them to Elias.  (*Id.* 988:15-989:23, 994:14-17.)

Later that day, Elias learned from a friend that Thomas died.  (*Id.* 739:22-740:5.).  Panicking, Elias said that they had to dispose of the robbery proceeds.  (*Id.* 740:16-21.)  Mejia gave Andres $500 and some marijuana.  (*Id.* 997:21-24.)  The next day, Elias found a ski mask and gloves in the apartment and gave them to Andres.  (*Id.* 745:4-746:13.)  Andres burned the mask, threw away the gloves, and tossed the controller in a sewer. (*Id.* 746:25-747:1, 1000:22-1001:6.)

On May 9, 2011, the police received an anonymous tip directing them to the Moros' apartment. (*Id.* 652:23-24.)  They brought Elias and Andres to the local precinct for questioning but later released them after they denied involvement in the robbery. (*Id.* 743:24-745:1.)  Feeling sick and paranoid, Andres returned to the precinct the next day and confessed. (*Id.* 1001:8-15.)  The police brought Elias back in, who confessed after being confronted with Andres's statement. (*Id.* 748:21-749:19.)  The police then issued "i-cards" (wanted cards) for Mejia and Mateo and interviewed Desiree and her sister, Roxanna. (*Id.* 880:18-881:3.)  Desiree consented to a cell phone search, which revealed an outgoing call from the morning of the robbery to "Lolo," Mejia's nickname. (*Id.* 712:15-19, 881:22-884:8.)  The police subpoenaed call records from Desiree's phone and two other phone numbers, which led them to Mejia and Mateo. (*Id.* 895:14-897:8.)

Police arrested Mateo in Pennsylvania on May 20, 2011. (*Id.* 897:9-17.)  They arrested Mejia in Rhode Island on July 20, 2011. (*Id.* 814:13-816:7.).  The State charged Mejia with murder, kidnapping, burglary, and robbery. (Pet. 1.)  The State brought the same charges against Mateo but tried him separately. (Opp'n 4 n.2.)

## II.   Procedural Background

### A.   Trial

Mejia proceeded to a jury trial before the New York Supreme Court, Queens County.  The State presented testimony from the Moros brothers, responding officers, paramedics, investigators, and Thomas's mother, Zelda.  The State also presented physical evidence from the crime scene and cell phone records showing the calls between Mejia, Elias, and Mateo on the day of the robbery and murder.  Mejia requested an adverse inference instruction on the ground that the State failed to produce the phone used by Mejia or photographs of it, but the trial court denied that request.  (Trial Tr. 1104:5-6, 1104:15-25.)

Before Andres's examination, Mejia's attorney sought permission to cross-examine him regarding psychiatric treatment at Bellevue Hospital a few years before the robbery.  (*Id.* 21:16-22:4, 707:5-14, 926:24-927:18.)  The court refused to allow this inquiry because its *in camera* review of Andres's medical records revealed nothing that might have affected Andres's perception or credibility.  (*Id.* 931:5-14.)  On direct examination, however, Andres acknowledged voluntarily seeking psychiatric treatment at Long Island Jewish Hospital *after* the robbery and explained that he was still receiving in-patient treatment at Creedmoor Hospital and taking psychiatric

medication at the time of his testimony.  (*Id.* 1005:2-1006:8, 1008:13-1009:24.)

Several witnesses testified that Thomas's dog had been stabbed during the robbery, but it was unclear from their testimony what happened to the dog afterward.  Thus, over Mejia's objection, the trial court allowed the State to offer limited testimony from the officer who transported the dog to an animal hospital for treatment.  (*Id.* 612:20-613:17.)

Mejia's theory in summation was that he had been "charged with a crime that he didn't commit" and that the Moros brothers "threw him under the bus" and framed him.  (*Id.* 1132:10-1133:2.) The State objected to this argument twice on the ground that there was "no evidence" to support it, and the trial court sustained each objection.  (*Id.*)  As to Zelda, Mejia argued that she "lied" about knowing that Mejia was one of the robbers and suggested that "she would want to find someone guilty for this crime."  (*Id.* 1116:8-9, 1116:23-24.)

Mejia objected to several comments during the State's summation.  He first objected to the State's opening passage, which began:

> Your home is supposed to be your sanctuary, the one
> place that you can feel safe and secure, your refuge
> from a dangerous wor[l]d.  Zelda Shanis, I submit to
> you, will never feel safe in her home again.  She's
> still living in the apartment where she was the victim
> of a home invasion where her son was . . . savagely
> murdered before her very eyes, where his blood was all

> over her kitchen floor, and I submit to you every time she walked in that room, she sees that image of her son lying in a pool of blood.
>
> No one deserves to be murdered, ladies and gentlemen, slaughtered like that, bound like an animal with zip [ties].  An 80 year old woman was duct taped and zip tied.  She could have died herself.  She could have had a heart attack at the very least.

(*Id.* 1139:10–24.)  The trial court sustained an objection after the "heart attack" comment and instructed the jury to "disregard that."  (*Id.* 1139:25–1140:2.)  Later in the State's summation, the court overruled a similar objection to the State describing Mateo as "evil."  (*Id.* 1142:23–1143:3.)

The trial court also overruled an objection to the State's comment that "if it wasn't for Andres Moros and the Herculean efforts" of law enforcement, Mejia "would never have been brought to justice."  (*Id.* 1140:3–10.)  Then, after the state described the "three month manhunt" to find Mejia, the trial court sustained two objections to comments stating that Mejia had been hiding from law enforcement.  (*Id.* 1163:12–1164:2.)  The trial court overruled an objection to the State's comment that "the only logical explanation" for Mejia's actions was that he was "a guilty man evading capture for as long as he could."  (*Id.* 1164:3–17.)

The court also overruled a defense objection that Mejia did not "have the burden" when the State attacked his theory of the case by asking the jury whether there was "any possible reason"

8

for the Moros brothers to have conspired to frame Mejia.  (*Id.*
1148:18–1149:3.)   The court later denied Mejia's mistrial motion
based on this line of argument.  (*Id.* 1167:6–20.)

Finally, Mejia objected when the State rebutted his attack
on Zelda's credibility as follows:

> Zelda Shanis didn't get up there and say, I recognize
> him.  That's the man who did this.  You think how easy
> would that have been for her when she got up on this
> witness stand.  How much she probably wanted to do
> that, I submit to you.  To say that I know that's the
> man who killed my son.  But she didn't say that,
> ladies and gentlemen.  What did she say?  She said I
> know who he is.  I am looking right at him, but she
> didn't make an identification because she can't.
> That's the truth, ladies and gentlemen.  They were
> wearing masks during this crime.  But in her heart of
> hearts, I submit to you she knows that it's him.

(*Id.* 1154:2–12).  The trial court sustained an objection
immediately after the "heart of hearts" comment and instructed
the jury to "disregard."  (*Id.* 1154:13–14.)

During the jury charge, the trial court instructed the jury
that the State had the burden to prove all elements beyond
reasonable doubt and the burden never shifted from the State to
Mejia.  (*Id.* 1170:19–1171:13.)  The trial court also instructed
the jury before summations that the summations were not evidence
and that the jury was the sole judge of the facts.  (*Id.* 1113:2–
19.)

Before the trial court submitted the case to the jury,
Mejia moved to dismiss on the ground that the State failed to

sufficiently corroborate the Moros brothers' testimony.  (*Id.* 1099-1101.)  The court denied the motion, finding no reasonable basis to conclude that Andres was an accomplice because he did not participate until after the crime occurred.  (*Id.* 1101:13-17.)  The court concluded that Elias was an accomplice as a matter of law, however, and read the stipulated accomplice jury charge as it applied to him.  (*Id.* 1101:18-22.)

The jury convicted Mejia on all counts.  (*Id.* 1237:4-1239:4.)  Before the sentencing, Mejia renewed his motion to dismiss and argued that the trial court at the very least should dismiss one of the kidnapping charges based on the merger doctrine.  (Sentencing Tr. 3:1-5:24, ECF No. 11-8.)  The court denied the motion and concluded the merger doctrine did not apply because the facts establishing the kidnapping charge differed from those establishing the robbery and burglary charges.  (*Id.* 7:8-8:8.)  The court then sentenced Mejia to concurrent terms on most of the counts, the longest of which was 25 years of imprisonment, to run consecutively to a term of 25 years of imprisonment plus five years of post-release supervision on the second-degree kidnapping conviction.  (*Id.* 14:2-19:18.)

**B.  Appeal**

On appeal to the Appellate Division, Second District, Mejia (1) objected to the trial court's merger doctrine ruling,

10

(2) challenged the trial court's refusal to give an accomplice charge as to Andres, and (3) argued that the State made improper comments at summation that prejudiced him. (Appellate Br. for Def.-Appellant ("Mejia's Appellate Br."), ECF No. 11-1 at 1–56.) In a *pro se* supplemental brief, Mejia raised the additional claims that the trial court (1) improperly admitted evidence regarding Thomas's dog, (2) improperly curtailed cross-examination into Andres's psychiatric history, (3) failed to give an adverse inference charge after the state did not show Desiree's phone or the phone's call log, and (4) improperly allowed "bolstering" evidence in the form of Zelda's testimony. (Supp. Appellate Br. for Def.-Appellant ("Mejia's Supp. Br."), ECF No. 11-1 at 116–71.)

The appellate court agreed with Mejia's merger doctrine argument and vacated his second-degree kidnapping conviction, but it otherwise affirmed the trial court's judgment. *People v. Mejia*, 93 N.Y.S.3d 364 (2d Dep't 2019). It rejected Mejia's accomplice charge claim, agreeing with the trial court that the record did not permit a reasonable inference that Andres acted as an accomplice. *Id.* It rejected as meritless Mejia's "remaining contentions, including those raised in his pro se supplemental brief," without further analysis. *Id.* The New York Court of Appeals denied leave to appeal without comment on April 16, 2019. *People v. Mejia*, 124 N.E.3d 717 (N.Y. 2019).

Mejia timely[3] filed this action on May 7, 2020, petitioning for a writ of habeas corpus under 28 U.S.C. § 2254 on the ground that he was convicted in violation of his federal constitutional rights.  Mejia's petition raises the two claims from his state appellate brief and four claims from his *pro se* supplemental brief that the appellate court rejected.  (Pet. 5–16.)

## LEGAL STANDARD

A petition for a writ of habeas corpus under 28 U.S.C. § 2254 is the vehicle by which a state prisoner obtains federal review of his or her state custody.  *Cook v. N.Y. State Div. of Parole*, 321 F.3d 274, 278 (2d Cir. 2003).  The court may issue the writ only if it finds that the petitioner is in custody in violation of federal law.  28 U.S.C. § 2254(a).  Any claim for which the petitioner seeks habeas relief must have been fairly presented for review and exhausted in state court.  28 U.S.C. § 2254(b)(1)(A); *O'Neal v. New York*, 465 F. Supp. 3d 206, 214 (E.D.N.Y. 2020).

---

[3] A habeas petitioner has one year from the date his or her state court conviction becomes final to seek relief in federal court.  28 U.S.C. § 2254(d)(1)(A).  A petitioner's state court conviction becomes "final" for habeas purposes, however, only after proceedings conclude in the United States Supreme Court or time expires to petition for a writ of certiorari in that court.  *Davis v. Racette*, 99 F. Supp. 3d 379, 384 (E.D.N.Y. 2015).  A petition for a writ of certiorari seeking review of a judgment of a lower state court that was subject to discretionary review by the state court of last resort must be filed within 90 days after entry of the order denying discretionary review.  U.S. Sup. Ct. R. 13(1).  Here, because Mejia did not seek relief in the United States Supreme Court, his state court conviction became final on July 15, 2019, 90 days after the New York Court of Appeals entered its order denying discretionary review of the Appellate Division's decision.  Thus, Mejia had until July 15, 2020, to file his Petition in this Court, and his May 7, 2020, filing was timely.

If the state court adjudicated the petitioner's claim on
the merits, the Antiterrorism and Effective Death Penalty Act
("AEDPA") requires the habeas court to give the state court's
decision great deference. *McCray v. Capra*, 45 F.4th 634, 640
(2d Cir. 2022). The state court need not explain its reasoning
for its decision to be considered "on the merits." *Johnson v.
Williams*, 568 U.S. 289, 298 (2013). If the petitioner presented
the claim to the state court and the state court denied relief,
the habeas court may presume the state court adjudicated the
claim on the merits absent any indication or state law principle
to the contrary. *Id.*

Under AEDPA, a state court decision on the merits must
stand unless it was (1) "contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States" or
(2) "based on an unreasonable determination of the facts in
light of the evidence presented" in the state court. 28 U.S.C.
§ 2254(d). "Clearly established federal law" means a holding,
as opposed to dicta, of a Supreme Court decision that existed at
the time of the state court's decision. *McCray*, 45 F.4th at
640. The habeas court may not use Second Circuit precedents to
"refine or sharpen a general principle of Supreme Court
jurisprudence into a specific rule" that the Supreme Court "has

13

not announced." *Jackson v. Conway*, 763 F.3d 115, 134 (2d Cir. 2014) (quoting *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013)).

A state court decision is "contrary to" clearly established federal law if it contradicts a Supreme Court decision on a legal question or decides a case differently from how the Supreme Court decided a case with materially identical facts. *McCray*, 45 F.4th at 640. A state court decision "involves an unreasonable application of" clearly established federal law if the state court identifies the correct legal rule from the applicable Supreme Court decision but unreasonably applies it to the facts of the petitioner's case. *See id.*

When a habeas petitioner proceeds *pro se*, the court holds the petition to less rigorous standards than it holds filings by counseled parties. *Licausi v. Griffin*, 460 F. Supp. 3d 242, 260 (E.D.N.Y. 2020). The court must liberally construe the petition to raise the strongest arguments it suggests. *Id.* Still, *pro se* petitioners are not exempt from the applicable procedural and substantive rules. *Banner v. Royce*, 525 F. Supp. 3d 417, 418 (E.D.N.Y. 2021).

## DISCUSSION

In resolving Mejia's Petition, the Court reviews the appellate court decision, which was the "last reasoned state-court decision to address" all asserted grounds for habeas relief after the New York Court of Appeals denied leave to

14

appeal without comment.  *See Carmichael v. Chappius*, 848 F.3d 536, 543 (2d Cir. 2017); *Royster v. Ercole*, No. 1:06-cv-12942(SAS)(JCF), 2008 WL 542505, at *6 (S.D.N.Y. Feb. 29, 2008) (explaining that when the New York Court of Appeals denies leave to appeal without comment, the habeas court "look[s] through" that decision to "the decision of the Appellate Division").

Here, Mejia presented every claim he raises in his Petition to the state appellate court either through counsel or in his *pro se* supplemental brief. (*Compare* Mejia's Appellate Br. 9 *and* Mejia's Supp. Appellate Br. 117-18 *with* Pet. 5-16.)  The appellate court provided a short analysis rejecting Mejia's accomplice instruction claim and concluded that Mejia's "remaining contentions, including those raised in his pro se supplemental brief, [were] without merit."  *Mejia*, 93 N.Y.S.3d at 364.  Though terse, the appellate court's opinion amounted to a merits adjudication of each of Mejia's claims.  *See Johnson* 568 U.S. at 298.  Thus, the Court applies AEDPA deference to each claim.

Additionally, because the Court may grant habeas relief only based on violations of federal law, *see* 28 U.S.C. § 2254(a), the Court must reject any claims in the Petition that are based solely on alleged state-law errors regardless of whether Mejia is correct that such errors occurred, *see Jones v.*

15

*Hendrix*, 599 U.S. 465, 490 (2023).  In evaluating Mejia's state-law claims, the Court observes the Second Circuit's admonition not to repackage alleged state law errors as federal errors by simply framing them as due process violations.  *See DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004).

## I.   Refusal to Give an Accomplice Charge

Mejia first argues that the appellate court erred in affirming the trial court's refusal to give an accomplice charge as to Andres.  (Pet. 5.)  State court jury charges generally present questions of state law inappropriate for review on a petition for habeas corpus.  *Bien v. Smith*, 546 F. Supp. 2d 26, 46 (E.D.N.Y. 2008).  To implicate federal law, the state law error regarding the jury charge must have been so egregious that it deprived the defendant of due process.  *Taylor v. Capra*, 412 F. Supp. 3d 126, 133 (E.D.N.Y. 2019); *see* U.S. Const. amend. XIV, § 1.  Federal due process does not require a state court to give a jury charge unsupported by the evidence.  *Bien*, 546 F. Supp. 2d at 47.

Accomplice testimony cannot support a conviction under New York law unless the State offers independent corroborating evidence tending to connect the defendant to the crime. N.Y. Crim. Proc. Law § 60.22(1).  The federal Constitution, however, contains no such prohibition against convictions based on uncorroborated accomplice testimony.  *Gomez v. Griffin*,

16

No. 1:17-cv-7249(JMA), 2021 WL 1224885, at *16 (E.D.N.Y. Mar. 31, 2021).  Like many other courts in this district, *see Nylander v. Smith*, No. 1:07-cv-457(SLT), 2010 WL 129229, at *5 (E.D.N.Y. Mar. 30, 2010) (collecting cases), the Court finds no basis to grant habeas relief based on New York's accomplice corroboration rule.

Because Mejia's claim regarding the lack of an accomplice charge is based solely on New York law, he cannot prevail unless the omission so infected the trial that the resulting conviction deprived him of due process.  *Gomez*, 2021 WL 1224885, at *16. Here, the appellate court explained that the record lacked evidence to permit a reasonable inference that Andres participated in planning or carrying out the robbery.  *Mejia*, 93 N.Y.S.3d at 364.  It agreed with the trial court that Andres was at most an "accessory after the fact" whose testimony required no corroboration under New York law and thus found the accomplice charge unwarranted.  *Id.*

The Court sees no flaw in the appellate court's analysis, much less one so egregious that it deprived Mejia of due process.  Andres was never asked to participate in the robbery. (Trial Tr. 982:21-983:17, 984:20-22.)  When Mejia returned home from the robbery, Andres was asleep and unaware it had even occurred until Mejia told him.  (*Id.* 986:15-17, 991:21-993:13.) His only involvement was washing Mejia's bloody clothes, (*id.*

17

988:15–989:23, 994:14–17), accepting proceeds from the robbery, (*id.* 997:21–24), and helping Mejia destroy evidence, (*id.* 746:25–747:1, 1000:22–1001:6), all of which occurred *after* the robbery.  On this record, the trial court's refusal to give an accomplice charge did not deprive Mejia of the right to a fair trial.

## II.  **Summation**

Mejia next claims the State's comments at summation deprived him of a fair trial.  (Pet. 7.)  Specifically, he argues the State (1) made "inflammatory comments designed to appeal to the jurors' sympathy," (2) "vouched for witness credibility," (3) "shifted the burden of proof," and (4) "invite[d] the jurors to focus on the 'herculean efforts' of the police to bring [Mejia] to justice."  (*Id.*)  The Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986), is clearly established federal law providing that a prosecutor's comments at trial can violate a defendant's rights if the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Jackson v. Conway*, 763 F.3d 115 at 144 (quoting *Darden*, 477 U.S. at 180).

Even improper comments by a prosecutor do not warrant habeas relief, however, unless the petitioner shows "actual

prejudice"[4] resulting from the comments.  *McCall v. Capra*,
102 F. Supp. 3d 427, 446–47 (E.D.N.Y. 2015) (quoting *Bentley v.
Scully*, 41 F.3d 818, 824 (2d Cir. 1994)).  A habeas court may
grant relief only based on "cumulative evidence of a proceeding
dominated by passion and prejudice," not based on "minor
aberrations in a prolonged trial."  *Id.* at 447 (quoting *Stewart
v. Lee*, No. 1:09-cv-4374(ENV), 2014 WL 3014608, at *5 (E.D.N.Y.
July 3, 2014)).

> **A.   Emotional Appeals**

In discerning the basis for Mejia's claim regarding the
State appealing to the jury's emotions, the Court looks to
Mejia's state court appeal.  His state court appellate brief
objected to the opening passage of the State's summation,
(Mejia's Appellate Br. 49–50), and to the State's description of
Mateo as "evil," (*id.* 51), as prejudicially inflammatory.

Considering the record in context, as the Court must, *see
Jackson v. Conway*, 763 F.3d at 146, this rhetoric did not
undermine Mejia's right to a fair trial.  The State's
description of "[y]our home" as a "refuge from a dangerous
wor[l]d" arguably approached an improper "safe streets"

---

[4] The Second Circuit in *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.
1998), developed a three-factor test that is still used in direct appeals to
assess whether prejudice resulted from *Darden* errors.  *Jackson v. Conway*,
763 F.3d at 146 n.33.  The Second Circuit has cautioned district courts
against continuing to use that test in habeas cases, however, because it
reflects a circuit-law refinement rather than clearly established Supreme
Court precedent.  *Id.*  Thus, the Court disregards the *Tankleff* factors in
resolving Mejia's claim.

argument, but even if could be fairly characterized that way, "it was no worse than other comments that other courts have found do not warrant habeas relief." *See Jackson v. Eckert*, No. 2:19-cv-4444(JS), 2023 WL 2477633, at *8 (E.D.N.Y. Mar. 13, 2023) (finding prosecutor improperly made "safe streets" argument but denying relief; collecting cases). The State's vivid description of Thomas's blood on the floor was proper because multiple witnesses testified to the amount of blood on the floor and the State published a photograph of the scene to the jury without objection. (Trial Tr. 605:4–606:22, 627:21–628:10.) The State's description of the murder as "savage[]" and of Thomas as being "bound like an animal" was supported by the evidence and did not undermine Mejia's right to a fair trial. Prosecutors are not forbidden from "vigorous advocacy" or using "colorful adjectives" in summation. *Portes v. Capra*, 420 F. Supp. 3d 49, 58 (E.D.N.Y. 2018) (quoting *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)). For the same reason, it was not prejudicial error for the State to refer to Mateo as "evil."

The State's speculation that Zelda "could have had a heart attack" was arguably more problematic because prosecutors may not imply the existence of evidence not before the jury, *see Driver v. Coveny*, No. 1:19-cv-3860(DC), 2023 WL 4066558, at *11 (E.D.N.Y. June 15, 2023) (citing *United States v. Williams*,

690 F.3d 70, 76 (2d Cir. 2012)), and there was no evidence Zelda had any particular heart condition.  Even if that statement was improper, however, it did not prejudice Mejia in the context of the whole trial.  The trial court immediately sustained an objection to that comment and issued a curative instruction, which the Court must presume the jury followed.  *See United States v. Batista*, 684 F.3d 333, 342 (2d Cir. 2012).  The trial court's instructions not to consider argument as evidence and not to factor their own sympathies into their deliberations further mitigated any prejudice that may have resulted.

Given the trial court's instructions and the overwhelming evidence against Mejia, the appellate court did not contradict or unreasonably apply *Darden* or any other clearly established federal law in rejecting Mejia's emotional appeal claim.  *See Harvey-Philips v. Smith*, No. 1:16-cv-3086(RJD), 2021 WL 4171899, at *6 (E.D.N.Y. Sept. 14, 2021) (finding challenged prosecutorial remarks did not infect trial with unfairness "even if better left unsaid" because "heart of the state's case" was not "prosecutor's stricken invitation to speculate"); *Williams v. Senkowski*, No. 2:03-cv-3123(DRH), 2016 WL 8711377, at *14 (E.D.N.Y. Jan. 22, 2016) (denying habeas relief on prosecutorial misconduct claim where trial court sustained objections and issued similar curative instructions).

**B.   Zelda's Credibility**

Mejia next argues that the State inappropriately "vouched for witness credibility" when it addressed Zelda's inability to identify him as one of the robbers.  (Pet 7.)  The State conceded in the appellate court that the "heart of hearts" comment was "rhetorical flourish" and would have been "better left unsaid."  (Appellate Br. for Resp't ("State's Appellate Br.") 98, ECF No. 11-1 at 57–105.)  Importantly, however, this passage came only after Mejia's attorney argued that Zelda "lied" about knowing that Mejia was one of the robbers and suggested that "she would want to find someone guilty for this crime."  (*See* Trial Tr. 1116:8–9, 1116:23–24.)  Additionally, the trial court sustained an objection immediately after the "heart of hearts" comment and instructed the jury to "disregard" it.  (*See id.* 1154:13–14.)

Personally vouching for a witness's credibility in summation is improper, but "what might superficially appear to be improper vouching . . . may turn out on closer examination to be permissible reference to the evidence in the case."  *Driver*, 2023 WL 4066558, at *11 (quoting *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998)).  Moreover, a prosecutor gains more leeway to comment on a witness's credibility after defense counsel attacks it.  *United States v. Farhane*, 634 F.3d 127, 168 (2d Cir. 2011).  Finally, even when improper vouching occurs,

22

the trial court may cure it by instructing the jury that
summations are not evidence and that the jury is the sole judge
of the facts. *Joseph v. Conway*, No. 1:07-cv-5223(DC), 2023 WL
3092877, at *6 (E.D.N.Y. Apr. 26, 2023) (citing *Gonzalez v.
Sullivan*, 934 F.2d 419, 424 (2d Cir. 1991)).

In context, the appellate court did not contradict or
unreasonably apply clearly established federal law in rejecting
Mejia's vouching claim.  Though Zelda never made a pre-trial or
in-court identification of Mejia, she gave physical descriptions
of the robbers that other testimony corroborated.  (*See* Trial
Tr. 619:16-20, 642:3-646:2.)  To the extent the State's comments
amounted to vouching, it was less than egregious considering
Mejia's attorney had already put Zelda's credibility in issue by
telling the jury she "lied" and speculating that she did so for
the sake of securing a conviction.  (*See id.* 1116:8-9, 1116:23-
24.)  Additionally, the trial court's curative instruction is
presumed to have cured any prejudice resulting from the "heart
of hearts" comment.  (*See id.* 1154:13-14.)

Other courts in this district have denied habeas relief
based on similar claims.  *See, e.g.*, *Joseph*, 2023 WL 3092877, at
*6-7 (State argued witness's testimony was "how" it knew
petitioner was "the right guy" in response to defense counsel's
earlier attacks on the witness, and trial court gave curative
instruction despite not sustaining defense counsel's objection);

*Parham v. Griffin*, 86 F. Supp. 3d 161, 174 (E.D.N.Y. 2015)
(trial court struck improper comments and gave curative
instruction after prosecution witness, a former assistant
district attorney, vouched for another prosecution witness's
credibility).  Accordingly, the Court finds that in context, to
the extent the State's comments amounted to improper vouching,
they did not deprive Mejia of a fair trial.

    **C.   Mejia's Theory of the Case**

    Mejia next argues that the State inappropriately shifted
the burden of proof by questioning his theory of the case that
the Moros brothers had framed him.  (*See* Pet. 7.)  The trial
court committed no error.  A prosecutor does not shift the
burden by simply pointing out that the defendant's theory of the
case lacks evidentiary support.  *United States v. Truman*,
581 F. App'x 26, 30–31 (2d Cir. 2014).  Here, the State merely
asked the jury to consider whether the evidence they heard
supported Mejia's theory that the Moros brothers framed him.
That was a fair response to Mejia's own argument.  *See id.* at
31.  Moreover, the trial court eliminated any doubt about where
the burden lay when it instructed the jury after summations that
the State had the burden to prove all elements beyond a
reasonable doubt and that the burden never shifted.  *See id.*
(denying habeas relief based on similar claim where trial court
gave similar instruction).  The appellate court did not

24

contradict or unreasonably apply clearly established federal law
by rejecting Mejia's burden-shifting claim.

**D.    The Manhunt**

Mejia's last challenge to the State's summation is that the
State improperly "invite[d] the jurors to focus on the
'herculean efforts' of the police in bringing [Mejia] to
justice." (Pet. 7.)

This part of the State's summation was proper. There was
ample testimony about the search for Mejia, which was relevant
because his defense was that he "did not participate in this
robbery." (*See* Trial Tr. 1124:21–22.) The State was entitled
to argue that Mejia's flight showed consciousness of guilt
because the trial court already agreed to submit that factual
dispute to the jury. (*See id.* 1105:5–1107:3; 1182:8–24.) The
State was also entitled to characterize law enforcement's
efforts as "Herculean." The Constitution does not prohibit
prosecutors from using "colorful adjectives" in summation, *see*
*Portes*, 420 F. Supp. 3d at 58 (quoting *Rivera*, 971 F.2d at 884),
and "Herculean" was a reasonable adjective to describe a three-
month manhunt by two local police departments and the United
States Marshals Service, (*see* Trial Tr. 1140:3–8, 1164:2–4.)

In short, none of the challenged comments from the State's
summation amounted to a prejudicial error. Further, given the
overwhelming evidence against Mejia and the trial court's

careful instructions throughout the trial, the comments did not collectively render the six-day and sixteen-witness trial as one "dominated by passion and prejudice." *See McCall*, 102 F. Supp. 3d at 446–47 (quoting *Stewart*, 2014 WL 3014608, at *5). Thus, the appellate court did not contradict or unreasonably apply clearly established federal law in rejecting as meritless Mejia's challenge to the State's summation, and Mejia may not obtain habeas relief on that ground.

### III. Thomas's Dog

Mejia's next habeas claim is that the appellate court erred by affirming the trial court's admission of evidence regarding Thomas's dog, which Mejia characterizes as evidence of an "uncharged, unindicted crime" of animal cruelty that unduly prejudiced the jury. (Pet. at 8.)

Like state court decisions regarding jury instructions, state court evidentiary rulings generally present state law questions inappropriate for review on a petition for habeas corpus. *See Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012). An evidentiary error cannot support habeas relief unless the error rose to the level of a due process violation. *Enoksen v. Squires*, 532 F. Supp. 3d 75, 93 n.13 (E.D.N.Y. 2021). Evidence erroneously admitted under state law does not violate due process if it was "at least arguably relevant," *Vega*, 669 F.3d at 126, and not "sufficiently material to provide the basis for

26

conviction" or "remove a reasonable doubt" that otherwise would have existed, *Heidgen v. Graham*, 420 F. Supp. 3d 1, 11 (E.D.N.Y. 2019).  Moreover, to overcome AEDPA deference, the petitioner must identify a Supreme Court decision clearly establishing that erroneously admitting the specific *kind* of evidence at issue violates due process.  *Evans v. Fischer*, 712 F.3d 125, 133–35 (2d Cir. 2013) (reversing district court for failing to do so).

Here, the evidence relating to Thomas's dog was at least arguably relevant because it related to and completed the narrative of events about the day of the robbery and confirmed that the intruders had, and used, a knife, the same weapon that killed Thomas.  *See Delancey v. Lee*, No. 1:15-cv-891(RRM)(CLP), 2019 WL 9051134, at *18 (E.D.N.Y. Nov. 4, 2019) (explaining that "New York courts often admit evidence of prior bad acts and uncharged crimes 'as background material' and to 'complete the narrative of events'") (quoting *Charles v. Fischer*, 516 F. Supp. 2d 210, 217 (E.D.N.Y. 2007)).  The evidence was not sufficiently material to provide the basis for Mejia's conviction or remove a reasonable doubt, however, because evidence of cruelty to an animal is unnecessary to sustain a conviction for the robbery, kidnapping, or murder of a person. There would have been ample evidence to sustain each of those convictions even if the trial court had excluded all the evidence related to Thomas's dog.

Moreover, the appellate court's decision could not have
contradicted or unreasonably applied clearly established federal
law because no Supreme Court precedent specifically addresses
whether admitting evidence of an uncharged crime violates due
process.  *See Abdul-Aleem v. Griffin*, No. 1:17-cv-5602(DC),
2023 WL 2682806, at *8 (E.D.N.Y. Mar. 29, 2023).  The closest
relevant Supreme Court decision explicitly declined to address
that question.  *See id.* (citing *Estelle v. McGuire*, 502 U.S. 62,
75 n.5 (1991) ("Because we need not reach the issue, we express
no opinion on whether a state law would violate the Due Process
Clause if it permitted the use of 'prior crimes' evidence to
show propensity to commit a charged crime.")).  Thus, regardless
of whether the trial court's evidentiary ruling was correct
under New York law, it does not implicate federal law and cannot
provide a basis for the Court to grant habeas relief.

## IV. Desiree's Cell Phone

Mejia next argues the appellate court erred in affirming
the trial court's refusal to instruct the jury to draw an
adverse inference from the State's failure to preserve Desiree's
cell phone or show a photograph of the phone's call log.  (Pet.
10.)

A defendant's entitlement to an adverse inference charge
arises under New York law, not federal law, so Mejia's claim
cannot support habeas relief unless the trial court made an

28

error so egregious that it deprived him of due process. *See Bowers v. Noeth*, No. 1:17-cv-1967(ERK), 2020 WL 6746829, at *7 (E.D.N.Y. Nov. 17, 2020). Here, the call log would not have revealed any significant information not already shown through other means. The detective who viewed the phone testified about its contents, and his testimony was corroborated by phone records and testimony from the phone companies' records custodians. (*See* Opp'n 30-31.) Moreover, Mejia's attorney in summation explicitly told the jury to draw an adverse inference from the call log's absence. (Trial Tr. 1136:21-1137:20.) The trial court's refusal to "take [Mejia's] side by emphasizing the point in a jury instruction" did not fundamentally deprive Mejia of a fair trial. *See Clanton v. Lee*, No. 1:14-cv-6024(BMC), 2015 WL 5693718, at *9 (E.D.N.Y. Sept. 27, 2015).

Construing Mejia's *pro se* Petition to raise the strongest possible arguments, however, *see Licausi*, 460 F. Supp. 3d at 260, the Court further concludes that Mejia would not prevail if his claim were framed as one based on suppression of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), or failure to preserve potentially useful evidence under *Arizona v. Youngblood*, 488 U.S. 51 (1988). Though not explicitly mentioned in the Petition, *Brady* and *Youngblood* are discussed in Mejia's pro se brief filed in the state appellate court. (*See* Mejia's Supp. Appellate Br. 142, 148.)

29

Here, the police cannot have suppressed Desiree's phone or
a photograph of its call log because they did not have
possession of either.  The government has a duty to *disclose*
exculpatory evidence, but it has no duty to *create* such
evidence.  *Dann v. Rabideau*, No. 9:07-cv-969(LEK)(RFT), 2008 WL
2704900, at *5 (N.D.N.Y. July 7, 2008); *United States v. Gray*,
648 F.3d 562, 567 (7th Cir. 2011); *United States v.
Alverio-Melendez*, 640 F.3d 412, 424 (1st Cir. 2011); *United
States v. Nguyen*, 98 F. App'x 608, 609 (9th Cir. 2004).  As the
State explained at trial, the police never took the phone into
evidence, nor did they take any photographs of it.  (*See* Trial
Tr. 1103:20-1104:19.)  Mejia asserts that "this was not true,"
(Pet. 10), but offers no evidence to support that assertion.
Such "vague, conclusory[,] and unsupported claims" cannot
support habeas relief.  *See Skeete v. New York*,
No. 1:03-cv-2903(FB), 2003 WL 22709079, at *2 (E.D.N.Y. Nov. 17,
2003); *see also Rodriguez v. Capra*, No. 1:20-cv-3141(MKV),
2023 WL 6394004, at *6 (S.D.N.Y. Sept. 29, 2023) (denying habeas
relief where petitioner "allege[d] that the prosecution
backdated a police report" but "provide[d] no evidence in
support of that accusation").  Thus, Mejia cannot obtain habeas
relief based on the omission of Desiree's cell phone or a
photograph of its call log from the trial.

## V.    Andres's Cross-Examination

Mejia next claims that the appellate court erred in affirming the trial court's decision to limit his attorney's cross-examination into Andres's mental health, which he claims violated his "right to confront witnesses" and "present a defense." (Pet. 16.)  He argues that such cross-examination was "relevant and necessary for the jury to assess [Andres's] credibility." (*Id.*)  This claim implicates a federal right because the federal Constitution guarantees criminal defendants the right to confront adverse witnesses. *See* U.S. Const. amend. VI.  The "main and essential purpose of confrontation is to secure . . . the opportunity of cross-examination." *Fuentes v. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016) (quoting *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974)).

The confrontation right does not permit a criminal defendant to circumvent the court's evidence rules, however. *United States v. Peters*, 543 F. App'x 5, 9 (2d Cir. 2013). Trial courts have "wide latitude" to limit cross-examination to avoid testimony only "marginally relevant." *Corby v. Artus*, 699 F.3d 159, 166 (2d Cir. 2012) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).  Specifically, a trial court may constitutionally restrict inquiry into a witness's psychiatric history if the proponent of such evidence fails to

31

reasonably link it to the facts at issue.  *Drake v. Woods*,

547 F. Supp. 2d 253, 267 (S.D.N.Y. 2008).

Under these standards, the trial court committed no error

in refusing to allow Mejia's attorney to question Andres

regarding his psychiatric treatment at Bellevue Hospital before

the robbery.  Based on its *in camera* review of the Bellevue

records, the court found they revealed nothing that would have

been relevant to Andres's perception or his credibility.  (Trial

Tr. 931:8-13.)  The court also noted that the treatment occurred

"years prior" to the robbery.  (*Id.* 931:5-8.)[5]

Moreover, even if the trial court did err, the error would

have been harmless.  "[S]ubstantial cross-examination of

[Andres's] mental health history was permitted," and "there was

no evidence that the records [from Andres's prior stay] would

not have been cumulative of [Andres's] testimony" regarding his

more recent treatment.  *See McGeachy v. Perez*,

No. 1:11-cv-3906(DC), 2023 WL 1830802, at *9 (E.D.N.Y. Feb. 7,

2023).  Andres freely testified on direct examination that he

was voluntarily admitted to Long Island Jewish Hospital four

months after the robbery because he was "overwhelmed" and

"wasn't functioning."  (*See* Trial Tr. 1005:2-18.)  He further

---

[5] The treatment occurred roughly three years before the robbery and five years before the trial.  Andres was nineteen years old when he received treatment at Bellevue.  (Trial Tr. 707:9-13.)  He was twenty-four when he testified in Mejia's trial, (*id.* 975:8-9), which occurred two years after the robbery.

testified that after "a couple stints" there, he voluntarily entered Creedmoor Hospital as an inpatient because he "just didn't feel safe" and had been receiving treatment and medications for his psychiatric disorders there for eight to nine months at the time of the trial. (*Id.* 1005:19–1006:8, 1008:13–23.)

Given this testimony, the jury had enough evidence about Andres's mental health to "assess [his] credibility." (*See* Pet. 16.) Andres's psychiatric treatment at Bellevue, which occurred *before* the robbery, theoretically could have had some independent relevance in the sense that it could have affected Andres's perception around the time of the robbery; however, the trial court's *in camera* review explicitly found "no perceptual disorders" and "alert oriented" cognitive function. (Trial Tr. 927:5–13.) Thus, Mejia cannot obtain habeas relief on his claim regarding Andres's cross-examination.

## VI. Zelda's Testimony

Mejia's last claim is that the State inappropriately "bolster[ed]" Zelda's identification testimony in violation of his due process rights. (Pet. 16.) Mejia argues that Zelda was unable to identify her assailants at trial but "after it was developed at trial during direct examination that the perpetrators [were] indeed two [H]ispanic, and not [B]lack males, as was [Zelda's] testimony, that was bolstering, when she

33

could not see what race the two perpetrators belong[ed] to."
(*Id.*)  He elaborates that "[t]he witnesses gave direct testimony
that the two suspects [were] talking in Spanish, that the chubby
one started off in English and then went into Spanish, and
that's when she determine[d] that they were Spanish or whatever
you want to call it."  (*Id.*)

Under New York law, there is a general rule against
admitting testimony that corroborates (or "bolsters") a
witness's prior identification of the defendant.  *Franco v. Lee*,
No. 2:10-cv-1210(SJF), 2013 WL 704655, at *7 (E.D.N.Y. Feb. 26,
2013).  Federal habeas petitioners typically cannot prevail on
"bolstering" claims, however, because such state-law evidentiary
claims do not implicate federal law.  *E.g.*, *id.* at *8;
*JeanCharles v. Bell*, No. 2:20-cv-4953(GRB), 2022 WL 2758064, at
*4 n.6 (E.D.N.Y. July 13, 2022); *Totesau v. Lee*,
No. 2:19-cv-6992(PKC), 2022 WL 1666895, at *38 (E.D.N.Y. May 25,
2022).

Further, bolstering generally does not implicate federal
due process.  The Second Circuit "has never regarded the
practice [of bolstering] as inimical to trial fairness."  *Woods
v. LaValley*, No. 1:12-cv-2339(RRM), 2019 WL 1409551, at *6
(E.D.N.Y. Mar. 28, 2019) (quoting *Orr v. Schaeffer*, 460 F. Supp.
964, 967 (S.D.N.Y. 1978)).  Though forbidden under New York law,
bolstering "is not forbidden by the Federal Rules of Evidence

and is not sufficiently prejudicial to deprive a defendant of his due process right to a fair trial." *Huber v. Schriver*, 140 F. Supp. 2d 265, 279–80 (E.D.N.Y. 2001) (quoting *Vega v. Berry*, No. 1:90-cv-7044(LBS), 1991 WL 73847, at *2 (S.D.N.Y. Apr. 29, 1991)).

From the Court's review of the record, it does not appear that the State engaged in bolstering at all. *See Crawford v. Lee*, No. 1:09-cv-4527(CBA), 2013 WL 696527, at *13 (E.D.N.Y. Feb. 26, 2013) (rejecting habeas claim styled as a bolstering claim when no bolstering appeared to have occurred); *Carr v. Fischer*, 283 F. Supp. 2d 816, 837 (E.D.N.Y. 2003) (same). Zelda simply testified about what she saw and heard during the robbery based on her own perceptions of the events as they occurred. (Trial Tr. 617:24-630:22.) To the extent some other part of Zelda's testimony or some other witness's testimony might be considered bolstering, that testimony did not deprive Mejia of a fair trial. Thus, Mejia cannot obtain habeas relief on this claim.

## CONCLUSION

The Court respectfully denies Mejia's Petition for a Writ of Habeas Corpus and dismisses this action with prejudice. The Clerk of Court is respectfully requested to enter judgment and serve a copy of this Memorandum and Order and judgment on *pro se* Petitioner, note service on the docket, and close this case.

In accordance with 28 U.S.C. § 1915(a)(3), the Court certifies that any appeal from this order would not be taken in good faith and thus denies *in forma pauperis* status for the purposes of an appeal.  *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

**SO ORDERED.**

Dated:      November 16, 2023
            Brooklyn, New York

KIYO A. MATSUMOTO
United States District Judge
Eastern District of New York